UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

AHMED HELMI, TAMER ABDALLA,
KUMAR ARUN, and YASER MOKHIMAR,

          Plaintiffs,

v.                                      Case No. 5:05-CV-36

SOLVAY PHARMACEUTICALS, INC.,          HON. GORDON J. QUIST
JAMES GRAYSON, and NANCY SUTIN,
Jointly and Severally,

          Defendants.
_____/

## OPINION

      This case was originally filed by four individuals, Ahmed Helmi ("Helmi"), Tamer Abdalla

("Abdalla"), Kumar Arun ("Arun"), and Yaser Mokhimar ("Mokhimar"), against Defendants, Solvay

Pharmaceuticals, Inc. ("Solvay"), James Grayson ("Grayson"), and Nancy Sutton-Nau ("Sutton-

Nau") (incorrectly named in the complaint as Nancy Sutin), in the Eaton County Circuit Court on

November 8, 2004.  On February 16, 2005, Defendants removed the action to this Court on the basis

of diversity jurisdiction.  Plaintiffs alleged various claims under the Michigan Elliott-Larsen Civil

Rights Act ("Elliott-Larsen Act"), M.C.L. §§ 37.2101 to .2804, and claims for intentional infliction

of emotional distress.  Pursuant to an Opinion and Order issued on June 1, 2005, and a Memorandum

Order issued on July 11, 2005, the Court denied Defendants' motion to dismiss the claims of

Plaintiffs Mokhimar and Abdalla for improper venue; granted summary judgment to Defendants on

all of Mokhimar's claims as time-barred; dismissed Sutton-Nau from the case because Mokhimar

was the only plaintiff asserting claims against her; and granted summary judgment to Defendants on

Abdalla's and Mokhimar's (as an alternative ground to the statute of limitations) Elliott-Larsen Act claims on the basis that the Michigan's anti-discrimination law did not apply to their claims. Therefore, the only claims remaining in the case are Helmi's and Arun's Elliott-Larsen Act claims and Helmi's, Arun's, and Abdalla's intentional infliction of emotional distress claims. Now before the Court is Defendants' motion for summary judgment on all remaining claims. For the reasons set forth below, with the exception of Helmi's harassment claim against Grayson, the Court will grant the motion and dismiss all other claims.

## I. Facts

Solvay is a Georgia corporation with its principal place of business in Georgia, and it is engaged in the sale of pharmaceuticals. Defendant Grayson is a resident of Ohio and, at all times relevant to the claims asserted in this case, was a Regional Business Director for Solvay. Helmi, Abdalla, and Arun are or were employed by, or applied for employment with, Solvay. Abdalla and Helmi are from Egypt and Arun is from India. All three are United States citizens. The facts relevant to Plaintiffs' respective claims are set forth below.

### A. Helmi

Helmi was hired by Solvay in February 2000 as a Professional Sales Representative at a starting salary of $50,000 plus commission. In June 2001, Helmi was promoted to Regional Marketing Manager and received a substantial pay increase. Helmi received another promotion in April 2003 to District Manager and received another raise. By January 2004, Helmi's salary was $96,000, plus commission. Helmi resigned on March 19, 2004, to accept a job with another pharmaceutical company.

As a Professional Sales Representative, Helmi was supervised by several different managers, including Gloria Newell and Nancy Sutton-Nau.[1]  Helmi testified that he did not have any problems with Newell and, that while he did have some personality-related problems with Sutton-Nau, Sutton-Nau never made any comments about his race or national origin and she supported him in his promotion to Regional Marketing Manager.[2]  (Helmi Dep. at 169-72, 183.)  Bart Walden promoted Helmi to Regional Marketing Manager and, along with Steve Jennings, supervised him after the promotion.[3]  (*Id.* at 181-82.)  Helmi apparently had no problems with Walden or Jennings.  Subsequently, Gurney Mills replaced Walden and/or Jennings as Helmi's supervisor.  When Helmi was promoted District Manager, he was supervised by Grayson, who also hired him into the District Manager position.[4]  (Grayson Decl. ¶ 4.)

Helmi claims that around 2002, a pattern of discrimination developed within Solvay, and he cites several incidents as support for his allegation.[5]  He notes that in a leadership meeting in early

[1]As noted above, Sutton-Nau was initially named as a defendant in this case but was dismissed from the case pursuant to the Court's July 11, 2005, Memorandum Order.

[2]Helmi testified that Sutton-Nau wanted him out of her district because Helmi's sales performance was so outstanding that it made the other sales representatives in her district, who were "not performing," look bad and, consequently, made Sutton-Nau's management performance look bad.  (Helmi Dep. at 177-80, 182-83.)

[3]The Court notes that Bart Walden is referred to in Helmi's deposition as Walden and Weldon.  The Court will refer to this individual as Bart Walden.

[4]Although Helmi asserts in his brief that Jim Prasch, Grayson's supervisor, actually hired Helmi into the District Manager position and that Grayson did not want Helmi promoted but could not override Prasch's decision, the only support for this statement is Helmi's own statements in his deposition, which are based solely upon hearsay.

[5]As one example, Helmi cites an alleged statement by Sutton-Nau that she did not want to hire Yasser Mokhimar, whom Helmi referred to Sutton-Nau as a potential sales representative, because she did "not need another Egyptian person."  (Helmi Dep. at 174.)  However, Helmi's

3

or mid-2002, an outside speaker commented that Arabs (apparently in addition to other groups or things) were "speed bumps on the highway of life" and that they were obstacles and troublemakers. (Helmi Dep. at 223-24, 245-47.)  Helmi says that he complained to Debbie Kishton in the Human Resources Department but no action was taken.  (*Id.* at 224.)  Helmi testified that following the conference, he received e-mails that were sent out to the entire company stating that Arabs or Middle Easterners are killers and troublemakers and that we (Americans) should not be buying oil from them and that participants in conference calls stated that they could not understand why Arabs are being raised to hate Americans.  (*Id.* at 255-56.)  In addition, Helmi related that Gurney Mills, who supervised Helmi in the Regional Marketing Manager position, commented that he thought that people with accents should not represent the company and tried to make things difficult for Helmi. (*Id.* at 225-26, 231-34.)  Helmi believed, based upon his conversations with others, that Mills treated him differently from other employees because he was Egyptian.  (*Id.* at 229-30.)  Helmi admitted, however, that Mills never demoted him, never cut his salary or commissions, never took any disciplinary action against him, never gave him negative evaluations, and always rated him "exceeds expectations" in every category on his evaluations.  (*Id.* at 238-240.)

Helmi testified that the discriminatory comments continued when he became a District Manager under Grayson.  He said that in May 2003, Grayson commented in a telephone conversation that "all Middle Easterners are troublemakers and you are one of them," and he told Helmi that everyone at the home office referred to Helmi as a "troublemaker."  (*Id.* at 259.)  Helmi said that Grayson repeated the same "troublemaker" comment in several subsequent telephone conversations.

---

testimony is hearsay because it is based upon an alleged conversation that he had with Gloria Newell. (*Id.*)

Helmi also recalled that at one point Grayson asked him, "why don't you go back home," and in October 2003, around Halloween, Grayson asked Helmi if he was going to dress up as "Bin Laden or like a terrorist." (*Id.* at 257, 264.) Grayson apparently repeated this question to Helmi in an e-mail, (E-mail from Grayson to Helmi of 10/28/03 ("What are you going to wear for the Halloween, are you going to dress up like Bin Laden or a terrorist!")), and Helmi stated that other employees made similar "Bin Laden" comments. (Helmi Dep. at 264-65.)

On September 3, 2003, Helmi met with Grayson and Jim Prasch, Grayson's supervisor, to discuss various issues. There is some dispute regarding the purpose of the meeting and the person who initiated it. According to Helmi, he requested the meeting in order to resolve discrimination and harassment issues that Grayson had with Helmi. (*Id.* at 268, 272.) Grayson, on the other hand, states that he and Helmi agreed to the meeting in order to explore some performance issues/developmental needs for Helmi that Grayson had identified after listening to a presentation that Helmi gave to Grayson and Prasch during a business review meeting in August 2003. (Grayson Dep. at 57-60; Grayson Decl. ¶ 5.) In any event, prior to the meeting, Helmi sent an e-mail to Grayson stating that he wanted Prasch and Paul Harding, the Vice President of Human Resources, to be involved in the meeting, and he made a similar request a few days later to Debbie Kishton, a Human Resources Consultant. In accordance with Helmi's request, Prasch agreed to attend the meeting. At the meeting, Grayson presented Helmi with a five-point plan for success (the "Plan for Success"), the text of which is set forth below:

> Ahmed, you have been a District Manager for the Grand Rapids district since March 2003 (March has been scratched out and April inserted). Your efforts over the ensuing months are appreciated. All new managers experience a very aggressive learning curve as they grow to understand their new roles. This being said, each

manager learns and develops at a different rate. To help accelerate your growth, I
have developed the Plan for Success ("PFS") noted below.

Plan for Success

- Ahmed, I would like to be more involved with your business and understand
  your approach to different business issues. Therefore, I would like to speak
  with you at least once a week over the phone to discuss your priorities and
  activities.

- Please send me a Weekly Activity Report (WAR) by Monday of the
  following week. This will be a large part of the discussion noted above.

- I would like to meet with you once a month so we can formally review the
  previous months activities and develop plans for the next month.

- Complete a 360 degree feedback survey. We will discuss the individuals that
  should participate in this review for you. Following receipt of the results, you
  and I will meet to discuss any further opportunities for development and we
  may adjust this Plan for Success.

- Complete an AMA Business Writing Course by the end of November.

This Plan for Success will stay in place until November 30, 2003. At that time we
will meet and discuss your progress. I can assure you that as your RBD I will assist
your efforts to continue to develop your skills as a district manager.

(Plan for Success.) Helmi testified that he was already doing the first two items on the list, that he

had previously requested the third item (meetings with Grayson once a month) when he was first

promoted to District Manager, and that he had actually requested the last item (attending an AMA

writing course). (Helmi Dep. at 289-91, 297.) The Plan for Success was never placed in Helmi's

personnel file, nor did it affect his pay or status. (Hudson Decl. ¶ 13.)

In early January 2004, Grayson completed Helmi's 2003 performance evaluation. Grayson

gave Helmi an overall rating of "meets expectations," and in three of the ten areas on the evaluation,

communication, competitive drive, and continuous learning, Grayson rated Helmi as "developmental

6

needs." Following the review, Helmi received a three percent raise. On or about January 18, 2004, Helmi faxed a letter to Erin Hudson in the Human Resources Department, captioned "Continued Violations of Civil Rights." In his letter, Helmi stated that he was unhappy with his 2003 evaluation by Grayson and indicated that it was retaliation by Grayson for Helmi's August 2003 complaint asking for help with Grayson. Helmi also noted that Grayson had continued to label him as a "troublemaker" since he is from the Middle East and that Grayson continued to direct unwarranted criticism at him. Soon thereafter, on February 13, 2004, Grayson forwarded to Hudson various e-mails among Grayson, Helmi, and Plaintiff Arun, whom Helmi supervised, regarding Arun's complaint that Dan Gobat, a Regional Business Director, called Arun a "troublemaker" twice during a return trip from a business meeting and told Arun that he had been following his conduct.

After Hudson received Helmi's and Arun's complaints, she began investigating them. (*Id.* ¶¶ 6, 12.) On February 15 and again, on February 16, 2004, Helmi sent Hudson e-mails stating that he and Arun felt comfortable discussing their discrimination complaints only in writing. (*Id.* ¶¶ 7, 14.) On February 17, Hudson sent an e-mail to Arun discussing the process for investigating his complaint and indicating that she would need to speak with him. She also spoke with Arun about his complaint the same day. (*Id.* ¶ 8.) On February 18, 2004, Hudson sent an e-mail to Helmi stating that she had made several attempts to contact Helmi but had not heard from him. She also noted that because Helmi had sent a fax to Grayson mentioning a "discrimination complaint," she was initiating a formal investigation and would need to speak with Helmi regarding the charge. Finally, she reminded Helmi that by refusing or failing to speak with her about the charge, Helmi would be impeding an investigation and warned him that failing to communicate with other employees, including Grayson, could be considered insubordination. (*Id.* ¶ 15 & e-mail from Hudson to Helmi

of 2/18/04, Hudson Decl. Ex. 8.)   That same day, Hudson spoke to Gobat regarding Arun's complaint.  Gobat denied calling Arun a "troublemaker" and indicated that he had supported Arun in his previous application for a promotion to the Medical Liaison position. (Hudson Decl. ¶ 9.) The following day, Thursday, February 19, Hudson sent Helmi an e-mail stating that as of that day, he was being placed on suspension with pay for impeding a human resources investigation and failing to contact Grayson as requested.[6]  (*Id.* ¶ 16.)  Helmi remained on suspension until the following Monday, February 23, when he contacted Hudson by telephone to continue discussing his complaints of discrimination against Grayson.  (*Id.* ¶ 17.)  Hudson continued her investigation and spoke with several people, including Grayson, Prasch, and Christa Townsend.  (*Id.* ¶ 18.)  However, before Hudson could complete her investigation, Helmi resigned from Solvay to go work for Schering-Plough Corporation, and at that point Hudson closed her investigation.  (*Id.* ¶ 19.)

**B.    Arun**

Arun was hired by Solvay in February 2000 as an Associate Sales Representative.  He was subsequently promoted to Professional Sales Representative on May 5, 2000, and is currently employed with Solvay in that position.  In 2001, Arun reported to Tim Gerrits.  Gerrits, in turn, reported to Dan Gobat, the Regional Business Director.  In 2001, Arun applied for two Medical Liaison positions.  He applied for a Medical Liaison position in Los Angeles, California, on February 26, 2001, and he applied for a Medical Liaison position in Atlanta, Georgia, on September 14, 2001. Each time, Arun was interviewed by several people, including Steven Wojtanowski, the Assistant Director of Medical Services, who was responsible for the hiring, firing, and training of Medical

---

[6]The Court notes that Helmi claims that he did call Hudson back but that she did not return his calls and that he was on sick leave during the time that Hudson was trying to reach him.  (Helmi Dep. at 348-50.)

Liaisons.  (Wojtanowski Dep. at 8, 13.)   Wojtanowski was the final decision-maker for both positions.  (*Id.* at 13.)  Arun was not hired.  Dee Fanning was hired for the Atlanta position, and Julia Takhtarov Romm was hired for the Los Angeles position.   Wojtanowski selected Fanning and Takhtarov Romm over Arun because they had superior skills and qualifications.  (*Id.* at 17, 25; Wojtanowski Decl. ¶¶ 10-22.)

On July 30, 2002, Arun wrote a letter to Harold Shlevin, Solvay's President, as part of a "Buck Stop Forum," in which Arun stated that he believed that he was rejected for the Medical Liaison position based upon his "ethnicity, national origin and educational background."   Arun testified that his letter was not a complaint, but merely information that he submitted in response to the President's invitation to employees to share their concerns.  (Arun Dep. at 232.)  Although Arun claims that Solvay never responded to his concerns, Solvay's internal documents show that the Human Resources Department investigated the allegations in his letter, found no evidence of discrimination, and relayed the results to Arun.  (Hudson Decl. ¶ 26; Frankel Mem. of 9/6/02.)

As mentioned above, on February 13, 2004, Helmi, who then was Arun's supervisor in the position of District Manager, forwarded to Hudson e-mails detailing Arun's complaints of harassment by Dan Gobat.  According to Arun, on January 15, 2004, he and other Solvay employees, including Gobat and Helmi, were flying back from a company meeting in Miami or Washington D.C.  Arun claims that as he was boarding the plane, he passed Gobat, who was seated in the first-class section, and said hello, to which Gobat responded, "hey you trouble maker."  (E-mail from Arun to Helmi of 1/24/04; Arun Dep. at 44-45.)  When Arun asked Gobat why he referred to him as a "trouble maker" Gobat said that he had been following Arun's conduct.  (Arun Dep. at 45.)  Arun further claims that when the Solvay employees were walking through the Detroit airport to

9

make a connecting flight, he overheard Gobat tell Helmi to "keep an eye on this troublemaker." (*Id.* at 46.)  Prior to that time, Gobat had been transferred to another region and Arun no longer reported to him.  Hudson investigated Arun's complaint and spoke with Gobat.  Gobat denied calling Arun a "troublemaker" and stated that he had supported Arun for the Medical Liaison position but that he was not a decision-maker for that position.  (Hudson Decl. ¶ 9.)  Hudson sent a memorandum to Arun on February 24, 2004, stating that based upon her investigation, she was unable to conclude that Solvay's policies were violated or that discrimination occurred.  (*Id.* ¶ 10.)

In March 2004, Arun applied for a District Manager position in the Women's Health Division in Los Angeles.  Melissa Barlow, a Sales Director, was the decision-maker for the position.  (Barlow Decl. ¶ 3.)  Barlow interviewed Arun and two other candidates.  She selected Chris Blackburn over Arun and Jason Policastri, the other candidate, because his qualifications were superior.  (*Id.* ¶ 10.)  In particular, Blackburn had received an overall competency rating of "Exceeds Expectations" on his most recent performance review and had served as an interim District Manager for the Women's Health Division in the San Francisco district.  In contrast, Arun failed to provide any information relating to his performance for the previous years, he did not possess sufficient knowledge about the women's health industry or the Women's Health Division of Solvay, and he demonstrated a lack of understanding regarding the position.  (*Id.* ¶¶ 11-12, 14-15.)

In August 2005, Arun applied for a Regional Account Manager position in California.  Ron Piela, the Director/Regional Accounts for Solvay, was the decision-maker for that position.  (Piela Decl. ¶¶ 2, 3.)  Piela interviewed Arun and two other candidates, Jill Compardo, a Senior Medical Liaison for Solvay, and Robert Bush, a Solvay District Manager.  Piela selected Compardo for the position because she had worked in management-level positions and had a total of six years of

managerial experience, she had established various relationships with influential members of the medical community and had provided scientific and product training to regional sales representatives and leadership teams, and she had handled multiple states and large territories. (*Id.* ¶¶ 15, 17, 19.) In contrast, Arun lacked managerial experience, he did not have experience handling larger geographic regions and higher level clientele, and he did not have significant experience in sales or marketing within the managed care industry. (*Id.* ¶ 13, 18, 20.) Piela said that he had previously declined to hire a white male who, like Arun, was a sales representative, because he lacked management experience. (*Id.* ¶ 14.)

### C.    Abdalla

Abdalla applied for an Illinois-based sales position with Solvay in 2003. He was referred to Solvay by Helmi. He initially interviewed with Gary Fernandez, a District Manager, in Chicago. Following that interview, Abdalla had a second interview with Fernandez and Grayson in Ohio. Abdalla claims that during the interview, Grayson refused to shake his hand, belittled him, and made discriminatory comments. For example, Abdalla claims that at the beginning of the interview, Grayson asked Abdalla, "you guys, you know, do you use cars in Egypt or just ride donkeys and camels?" (Abdalla Dep. at 66.) He next asked, "what kind of paper do you guys use," referring, as Abdalla understood it, to Egyptians using papyrus. (*Id.* at 67.) Grayson then asked Abdalla whether he sold antibiotics in a pill or a bag, which Abdalla took as a further "jab" at his nationality. (*Id.*) Fernandez attempted to redirect the interview to relevant topics but Grayson failed to pick up on Fernandez' lead. (*Id.* at 67-68.) Grayson commented that Abdalla's accent was "not bad for an Egyptian," and he told Abdalla that he was well-dressed and asked Abdalla where he purchased his suit. (*Id.* at 68.) Grayson also noted that Abdalla had obtained his veterinary degree in Egypt and

11

asked him whether he thought that he could practice as a veterinarian in the United States.  (*Id.* at 68-69.)  Finally, Grayson noted that Abdalla had submitted an action plan and said, in what Abdalla believed to be a condescending manner, "interesting, you can do an action plan, too."  (*Id.* at 69.) At the end of the interview Grayson refused to shake Abdalla's hand.  (*Id.* at 71-72.)  Abdalla was not hired for the position.

## II.  <u>Motion Standard</u>

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56.  Material facts are facts which are defined by substantive law and are necessary to apply the law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A dispute is genuine if a reasonable jury could return judgment for the non-moving party.  *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992)(quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## III.  <u>Discussion</u>

As set forth above, Helmi and Arun allege claims under the Elliott-Larsen Act and all three Plaintiffs allege claims for intentional infliction of emotional distress ("IIED").  Helmi alleges, in addition to his IIED claim: (1) race and national origin discrimination; (2) racial harassment; (3) retaliation; and (4) constructive discharge.  Arun alleges, in addition to his IIED claim: (1) race and national origin discrimination based upon Solvay's failure to promote him to the Medical Liaison,

District Manager, and Regional Account Manager positions; (2) racial harassment; and (3) retaliation.

## A.    Race and National Origin Discrimination

In order to maintain a claim under the Elliott-Larsen Act for race or national origin discrimination, a plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence.  *See Pomranky v. Zack Co.*, 159 Mich. App. 338, 343, 405 N.W.2d 881, 883-84 (1987) (per curiam).  A plaintiff may establish a prima facie case by showing either intentional discrimination or disparate treatment.  *See Reisman v. Regents of Wayne State Univ.*, 188 Mich. App. 526, 538, 470 N.W.2d 678, 685 (1991) (per curiam).    To prove intentional discrimination, sometimes referred to as a direct evidence or mixed motive case, *see Wilcoxon v. Minn. Mining & Mfg. Co.*, 235 Mich. App. 347, 360-61, 597 N.W.2d 250, 257 (1999), the plaintiff must show that: (1) he was a member of the affected class; (2) he was subjected to an adverse employment action; (3) the defendant was predisposed to discriminating against members of the affected class; and (4) the defendant actually acted upon that predisposition in taking the adverse action.  *See Reisman*, 188 Mich. App. at 538, 470 N.W.2d at 685.  If the plaintiff is able to meet this burden,

> in addition to challenging the credibility of the plaintiff's claims of discrimination, in a case involving direct evidence of discriminatory action, the employer may also assume the burden of persuading the factfinder that, even if the plaintiff's allegations are true, the employer would have made the same decision without consideration of discriminatory factors.

*Harrison v. Olde Fin. Corp.*, 225 Mich. App. 601, 613, 572 N.W.2d 679, 684 (1997).  A plaintiff may also establish a prima facie case based upon circumstantial evidence through the burden-shifting approach articulated in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973).  *See*

13

*Sniecinski v. Blue Cross & Blue Shield of Mich.*, 469 Mich. 124, 133-34, 666 N.W.2d 186, 193 (2005).  Under this framework, the plaintiff may establish a prima facie case by presenting evidence that: (1) he belongs to a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) he was rejected under circumstances giving rise to an inference of unlawful discrimination.  *See id.* at 134, 666 N.W.2d at 193.  If the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *See id.*  If the defendant produces such evidence, the presumption is rebutted, and the burden shifts back to the plaintiff to show that the employer's reasons were merely pretext and that unlawful discrimination was the true reason for the employer's action.  *See id.*  Under either approach, "a plaintiff must establish a causal link between the discriminatory animus and the adverse employment decision."  *Id.* at 134-35, 666 N.W.2d at 193.

### 1.    Arun's Claims

As the Court understands it, Arun alleges that Solvay discriminated against him by failing to promote him.  Solvay contends that his claims must be dismissed on procedural grounds.  Specifically, Solvay asserts that the claims involving the Medical Liaison positions, for which Arun applied in 2001, are time-barred and that Arun waived any claims based upon the 2004 District Manager position and the 2005 Regional Account Manager position by failing to plead such claims.  The Court agrees.

As the Court noted in its July 11, 2005, Memorandum Order, Elliott-Larsen Act claims are subject to a three-year statute of limitations.  *See Hollowell v. Mich. Consol. Gas Co.*, 50 F. Supp.2d 695, 702 (E.D. Mich. 1999).  Arun applied for the Medical Liaison positions in February and March of 2001.  Solvay has provided evidence that the successful candidates were offered their positions

14

more than three years prior to the date on which Arun filed his complaint.  (Hudson Decl. ¶ 23.)  It is thus reasonable to infer that Solvay informed Arun that he was not selected for those positions before or shortly after the offers were made to the successful candidates.  Although Arun filed an affidavit in response to Defendants' motion, he did not allege that he was notified of the hiring decision after November 8, 2001, nor does he address the limitations issue anywhere in his brief. Thus, Arun has failed to rebut Solvay's evidence showing that Arun's claims based upon the Medical Liaison position are time-barred.

Solvay contends that Arun waived his claims based upon the 2004 District Manager position and the 2005 Regional Account Manager position because he did not specifically plead those claims in his complaint.  Federal Rule of Civil Procedure 8(a) embodies the principle of notice pleading, requiring only that the pleading provide "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "Such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S. Ct. 992, 998 (2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103 (1957)).  The Sixth Circuit has held that while the pleading requirements under Rule 8 are not onerous, plaintiffs must at least "allege a factual predicate to support [their] claims." *Ruffin v. Nicely*, 183 F. App'x 505, 512 (6th Cir. 2006) (internal quotations omitted).  At a minimum, in a discrimination action based upon a failure to hire or promote, this would include identification of the specific position for which the plaintiff applied and was rejected. *See Johnson v. City Univ. of N.Y.*, No. 00 CIV. 4964 WK RLE, 2002 WL 1750841, at *4 (S.D.N.Y. July 24, 2002) (holding that the plaintiff failed to provide a short and plain statement

of his claim sufficient to fulfill Rule 8's notice pleading requirements because he "fail[ed] to indicate for which available position CUNY failed to hire him").[7]

Apart from the above procedural grounds, Solvay is entitled to summary judgment on the merits because Arun has failed to present any evidence showing that race or national origin discrimination played any part in the decisions not to promote Arun to the positions for which he applied. Although Plaintiffs generally assert that they have presented direct evidence of discrimination, (Pls.' Resp. to Defs.' Mot. at 19 n.17), Arun fails to identify any direct evidence of discrimination against him in connection with his desired promotions. Therefore, he must rely upon the *McDonnell Douglas* framework to establish his prima facie case.

With regard to the Medical Liaison positions, although Arun has shown that he was qualified and rejected for those positions, he fails to present a prima facie case because he has not presented any evidence that he was rejected under circumstances giving rise to an inference of discrimination. Arun's proofs in this regard are essentially based upon his own feelings or speculation, not evidence. For example, when Arun was asked whether anybody said or did anything that made him believe that he did not get the Medical Liaison positions because of his race or national origin, he testified:

> It makes me believe all the time, but my belief has nothing to do. I can't prove it. I believe in my heart without being biased, if I have to put myself into this, okay, am I thinking right or am I just making a case for no reason. I would say definitely there is a bias against me from different level and especially the level around me, who just does not want me to – to go and do anything managerial.

---

[7]Arun also claims in his affidavit that in addition to the two Medical Liaison positions in 2001, the 2004 District Manager position, and the 2005 Regional Account Manager position, "I applied routinely for nearly a dozen such positions throughout 2003-2005, and despite being qualified for all, and recommended routinely for same by Manager Helmi, I was denied each and everyone, and all went to Caucasian Americans." (Arun Aff. ¶ 4.) In spite of this vague allegation, Arun fails to identify, let alone provide any evidence regarding, the specifics of these alleged positions, including the decision-makers.

(Arun Dep. at 199.)  Arun admitted that none of the people who interviewed him said anything that led him to believe that he was not going to get the job because of his race or national origin.  (*Id.* at 188.)  In fact, Arun testified that nobody at Solvay, including Gobat, ever said anything to him about his race, ethnicity, or national origin.  (*Id.* at 54-55.)  Arun said that Frank Lucas, the Human Resources Manager, told Arun that he did not receive the Medical Liaison positions because of his communication skills, but Lucas never said anything about Arun's accent or anything else having to do with Arun's race or national origin.  (*Id.* at 220-21.)  Similarly, while Arun contends that Gobat (Arun's Regional Business Manager during 2001) did not support him for the Medical Liaison positions, Arun failed to identify anything that Gobat said or did to hamper or interfere with his promotion to the Medical Liaison position, noting that he merely "felt as if [Gobat] just didn't like my ethnicity or national origin."  (*Id.* at 117-18.)  Moreover, Gobat's testimony that he did not provide any input to anyone in connection with Arun's applications for other positions within Solvay stands unrebutted.  (Gobat Dep. at 19.)

Arun contends that he must be the victim of unlawful discrimination because he was chosen for a preceptorship – a brief project management assignment in Solvay's home office – and Nancy Frankel, who apparently oversaw his work, assured him that he would be hired as a Medical Liaison (then known as a Professional Sales Associate).  Arun further contends that completion of a preceptorship program in the past has always led to a Medical Liaison position and that at some point he was actually assigned to perform some of the duties of a Medical Liaison.  Assuming all of this to be true, none of it would support the conclusion that Arun was not hired into either of the Medical Liaison positions because of his race or national origin.  Apart from that, there is no factual basis for Arun's allegation that a preceptorship always led to a Medical Liaison position.  Steven

17

Wojtanowski, who worked with Arun during his preceptorship and was the decision-maker for the Medical Liaison positions, stated that a preceptorship "by no means is a guarantee of attaining a Medical Liaison position at Solvay in the future," and noted that at least one other employee who completed a preceptorship was not hired for a Medical Liaison job. (Wojtanowski Decl. ¶ 15.) Moreover, Arun admitted that the duties Helmi assigned to him were not the same as those of a Medical Liaison, (Arun Dep. at 105), and because Helmi did not supervise Arun until March of 2003, Arun's performance of such duties are irrelevant to his 2001 applications. Finally, even if Arun were able to establish a prima facie case, he has failed to present any evidence rebutting Solvay's evidence that the candidates selected for the Medical Liaison positions were more qualified than Arun.

With regard to the District Manager and Regional Account Manager positions, assuming that Arun was qualified for those positions, he has not presented any evidence to support his assertion that he was rejected based upon his race or national origin.[8] First, Arun has offered no evidence tending to show that the decision-makers for those positions, Melissa Barlow and Ron Piela, said or did anything to indicate that they were predisposed to discriminate against persons from India or Middle Easterners in general. Arun testified that after the interview, Barlow told him that his communication skills were lacking, that he should read books on management, and that he should

---

[8]In assuming that Arun was qualified for these positions, the Court does not conclude that Arun has met his burden on this issue. Solvay has presented substantial evidence that Arun was not qualified for these positions because he had not performed at a sufficient level and he lacked managerial experience, among other things. Arun has not offered any of his own evidence to refute Solvay's evidence, other than statements by Helmi in his affidavit that based upon his review of the qualifications for each of the positions, Arun was qualified for them. There is no evidence that Helmi was ever responsible for hiring anyone for a District Manager or Regional Account Manager or that Helmi otherwise had some base of knowledge or experience to give an opinion of Arun's qualifications for these positions.

interview managers before he applied for another management position.  (*Id.* at 252-53.)  Barlow never mentioned Arun's race or national origin.  (*Id.* at 254.)  Arun testified that Piela indicated that Arun was not selected for the Regional Account Manager position because Piela preferred a candidate with prior management experience as a District Manager or a Medical Liaison.  (*Id.* at 257-58.)  Neither Barlow's nor Piela's statement supports an inference of unlawful discrimination.  Arun also suggests that Grayson possibly influenced Barlow or Piela, but he admitted that he has no personal knowledge that Grayson ever said anything to them, (*id.* at 137), nor has he presented any evidence to support this contention.  Moreover, Arun has not presented any evidence that Grayson ever said anything to him that would indicate that Grayson harbored any animus toward Arun based upon his race or national origin.[9]  Finally, Arun has failed to present any evidence to refute Solvay's legitimate nondiscriminatory reason that the candidates selected for these positions were more qualified than Arun.

### 2.  Helmi's Claims

Solvay contends that it is entitled to summary judgment on Helmi's discrimination claims because Helmi cannot show that he was subjected to an adverse employment action and because he was not treated less favorably than a similarly-situated non-protected employee.  The Court agrees.

Michigan courts have stated that in the context of a discrimination claim, "an adverse employment action (1) must be materially adverse in that it is more than 'mere inconvenience or an alteration of job responsibilities,' and (2) must have an objective basis for demonstrating that the

---

[9]Arun states in his affidavit that when Helmi became his direct supervisor, Grayson said to Arun, "you now have a Far East Guy, maybe you can get promoted."  (Arun Aff. at 5.)  This statement contradicts Arun's prior deposition testimony that when Grayson mentioned that Helmi had the "same background" as Arun, Grayson explained that Helmi "was also a sales rep, you knew him when he was the sales rep."  (Arun Dep. at 135-36.)

change is adverse, rather than the mere subjective impressions of the plaintiff." *Meyer v. City of Ctr. Line*, 242 Mich. App. 560, 569, 619 N.W.2d 182, 188 (2000) (quoting *Wilcoxon*, 235 Mich. App. at 364, 597 N.W.2d at 258).  In *Pena v. Ingham County Road Commission*, 255 Mich. App. 299, 660 N.W.2d 351 (2003), the court stated:

> Although there is no exhaustive list of adverse employment actions, typically it takes the form of an ultimate employment decision, such as a "termination in employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *White v. Burlington N. & Santa Fe Ry. Co.*, 310 F.3d 443, 450 (6th Cir. 2002) (citing *Kocsis v. Multi-Care Mgt. Inc.*, 97 F.3d 876, 886 (6th Cir. 1996); *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993); *Hollins v. Atlantic Co., Inc*, 188 F.3d 652, 662 (6th Cir.1999)).  *See also Hilt-Dyson v. Chicago*, 282 F.3d 456, 465-66 (7th Cir. 2002).  In determining the existence of an adverse employment action, courts must keep in mind the fact that "[w]ork places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." *Blackie v. Maine*, 75 F.3d 716, 725 (1st Cir. 1996).

*Id.* at 312, 660 N.W.2d at 358-59.[10]

Helmi contends that the Plan for Success that Grayson gave to Helmi, Grayson's overall "meets expectations" rating in Helmi's 2003 performance appraisal, and the brief two-day

___

[10]After an en banc hearing, the Sixth Circuit vacated its decision in *White* reported at 310 F.3d 443 and cited by the Michigan Court of Appeals in *Pena*. *See White v. Burlington N. & Santa Fe Ry Co.*, 364 F.3d 789 (6th Cir. 2004).  The United States Supreme Court granted certiorari on the issue of the proper standard for adverse employment actions under Title VII's anti-retaliation provision as distinguished from substantive discrimination claims. *See Burlington N. & Sant Fe Ry. Co. v. White*, 126 S. Ct. 2405 (2006).  The Court held that a different standard applies to retaliation claims and that the anti-retaliation provision is not limited to discriminatory actions that affect the terms and conditions of employment. *See id.* at 2412-13.  Although the scope of adverse actions may be broader in the context of retaliation claims, the Court nonetheless emphasized that the action must produce a material consequence for the employee, as opposed to "trivial harms," and that the standard for judging the harm is how a "reasonable employee" would perceive the harm. *See id.* at 2414-15.

administrative suspension with pay constituted adverse employment actions.  Contrary to Helmi's argument, none of these actions gave rise to adverse consequences with any material significance.

Although Helmi attempts to portray the Plan for Success as disciplinary in nature, the text of the document, as well as the context in which it was presented to Helmi, show that it was intended as a coaching tool to assist Helmi in transitioning to his new role as a District Manager.  The document merely sets forth a list of things for Helmi to do as a roadmap to becoming a better manager.  As set forth above, Helmi admitted that he was already doing the first two items, that he had previously requested the third item, and that he wanted to take a business writing course – the fifth item.  As for the fourth item, a complete 360 degree feedback survey, it is difficult to see how a feedback survey could be viewed, from an objective standpoint, as materially adverse.  In fact, the evidence shows that Helmi's stated concerns with Grayson were that Grayson did not support him and gave him inconsistent directions.  Given these concerns, Grayson's act of providing Helmi a Plan for Success in order to assist his development can only be characterized as a positive employment action.[11]

The Court also concludes that the overall ranking of "meets expectations" by Grayson on Helmi's 2003 performance appraisal does not constitute an adverse employment action, even though Helmi received a "developmental needs" rating in three categories.  The Sixth Circuit has held that low ratings on a performance appraisal, alone, are insufficient to constitute an adverse employment

_____

[11]Arun contends that the Plan for Success was disciplinary in nature because Grayson admitted as much in his deposition.  Grayson actually testified that it is "the beginning of the disciplinary process," which, taken in context, can be reasonably construed to mean that if Helmi was not successful in developing his managerial performance, some disciplinary action might occur. However, such speculation is irrelevant because, as the Court has stated, the Plan for Success itself cannot be characterized as discipline, and the evidence shows that the Plan for Success was not a significant issue after the September meeting.

action, especially where the employee receives a merit raise.  *See Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999) (noting that "[s]atisfactory ratings in an overall evaluation, although lower than a previous evaluation, will not constitute adverse employment action where the employee receives a merit raise").  Helmi generally argues that his performance rating was adverse because he received a three percent raise rather than an average five-to-six percent raise as he had received in previous years.  Yet, Helmi provides no evidence showing that he would have received a larger raise even if he had received an overall rating of "exceeds expectations."  Helmi's speculation about his raise also fails to account for the fact that his 2003 evaluation was his first and only evaluation as a District Manager and the first and only evaluation by Grayson as his direct supervisor.

Similarly, the two-day administrative suspension with pay did not constitute an adverse employment action.  The Sixth Circuit and other courts have held that a suspension with pay and full benefits pending a timely investigation is not an adverse employment action.  *See Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) (holding that the plaintiff did not suffer an adverse employment action when she was suspended with pay pending a timely investigation into suspected wrongdoings); *Moore v. Miami-Dade County*, No. 02-33421, 2005 WL 3273722, at *11 (S.D. Fla. Sept. 30, 2005) ("The courts have specifically held that a suspension with pay for a short period of time is not an adverse employment action.") (collecting cases). Here, Helmi was suspended with pay for only about two days until the Human Resources Department could determine why Helmi was not responding to calls from Grayson or Hudson.  These facts distinguish this case from *White v. Burlington Northern & Santa Fe Railway Co.*, 364 F.3d 789 (6th Cir. 2004), in which the Sixth Circuit observed that "[t]aking away an employee's paycheck for over a month is not trivial, and if motivated by discriminatory intent, it violates Title VII."  *Id.* at 802.

22

Apart from the above actions, Helmi claims that his budget was wrongly cut, his day-to-day duties were increased, and he was denied "needed and deserved recommendations" as well as "promotion[al] opportunities."  Helmi fails to support his allegations with any specifics that might support a conclusion that these actions constituted adverse employment action or were motivated by discriminatory animus.  For example, there is no evidence regarding the amount of the alleged budget cut or the effect that it had on Helmi's ability to do his job, nor is there any evidence that a similarly-situated employee outside of the protected class did not experience a similar budget cut. Similarly, with regard to the alleged increase in duties, Helmi has not shown what additional duties he was required to perform and why such duties were not within his job responsibilities, nor has he shown that other similarly-situated comparators were not assigned similar duties.  Finally, he fails to provide any evidence regarding the recommendations or promotional opportunities he sought, including when and from whom he sought them.

**B.      Retaliation**

In order to establish a prima facie case of retaliation under the Elliott-Larsen Act, a plaintiff must show:  (1) that he engaged in a protected activity; (2) that the defendant was aware of this fact; (3) that the defendant took an employment action that was adverse to the plaintiff; and (4) a causal connection between the protected activity and the adverse employment action.  *Meyer*, 242 Mich. App. at 569, 619 N.W.2d at 188 (citing *DeFlavis v. Lord & Taylor, Inc.*, 223 Mich. App. 432, 436, 566 N.W.2d 661, 663 (1997)).  "[I]n order to show causation in a retaliatory discrimination case, '[p]laintiff just show something more than merely a coincidence in time between protected activity and adverse employment action.'" *Garg v. Macomb County Cmty. Mental Health Servs.*, 472 Mich.

23

263, 286, 696 N.W.2d,  646, 660 (2005) (quoting *West v. Gen. Motors Corp.*, 469 Mich. 177, 186, 665 N.W.2d 468, (2003)).

### 1.    Arun's Claims

Arun must first show that he engaged in protected activity.  "Protected activity includes opposing a violation of the Civil Rights Act, making a charge under the Civil Rights Act, filing a complaint under the Civil Rights Act, or participating in an investigation, proceeding, or hearing under the Civil Rights Act."  *Harris-Gordon v. DaimlerChrysler Corp.*, No. 267136, 2006 WL 2741989, at *5 (Mich. Ct. App. Sept. 26, 2006) (per curiam) (quoting M.C.L.A. § 37.2701(a)).  In order to establish this first requirement, Arun relies upon his letter to the President of Solvay in July 2002 as part of the Buck Stop Forum and his 2004 e-mails to Helmi regarding Gobat's "troublemaker" comments.  Arun also asserts in his affidavit that he complained to the Human Resources Department regarding discrimination in 2003-2005, although he fails to present any evidence to support this assertion, and the Court notes that he failed to mention such complaints in his deposition.

For purposes of its analysis, the Court will assume without deciding that Arun's July 2002 letter to Solvay's President, his 2004 complaints regarding Gobat, and his recently asserted claims in 2003 to the Human Resources Department constituted protected activity.  *See e.g., Burkhardt v. Blue Cross Blue Shield of Mich.*, No. 197988, 1999 WL 33455100, at *1 (Mich. Ct. App. Jan. 22, 1999) (stating that "the 'opposition clause' has been interpreted to protect employees who protest discrimination both formally and informally, including those who complain to high management").  Even with the benefit of such assumption, however, Arun's retaliation claim fails because he has failed to show that he was subjected to an adverse employment action that was causally connected

24

to his protected activity.  There is no dispute that Arun's rejection for the District Manager position in 2004 and his rejection for the Regional Account Manager position in 2005 constitute adverse employment actions.  But any claim based upon these actions fails because Arun did not present any evidence to establish a causal connection.  Arun applied for the District Manager and Regional Account Manager positions almost two years and more than three years, respectively, after he sent the letter to Solvay's President in July 2002.  Given the long periods of time that transpired between the letter and the rejections, there is no reasonable basis to infer that the rejections were based upon retaliatory motives.  Moreover, Arun has failed to present any *evidence* that even might support an inference  that either of the decision-makers for those positions, Barlow and Piela, were aware of Arun's letter to the President.  It is true that Arun's rejection for the District Manager position in 2004 occurred only  a couple of months or so after Arun complained about Gobat, but the same cannot be said for the Regional Account Manager position, which occurred over a year later.  More importantly, Solvay has presented evidence showing that neither Barlow nor Piela was aware of Arun's complaints when they made their hiring decisions for those positions.  (Barlow Decl. ¶ 18; Piela Decl. ¶ 12.)  Arun has failed to present any admissible evidence to refute Solvay's evidence.

Apart from the District Manager and Regional Account Manager rejections, Arun also claims that he received a lower raise in 2003, a reduced marketing budget, and a negative evaluation in 2004.  These allegations provide no support for his claim.  First, with regard to his allegation that he received a pay raise of only 1.12% in 2003, Arun admitted in his deposition that this increase was merely a salary adjustment and that he received an additional merit increase and that it occurred in 2001, before he made any complaints, not 2003.  (Arun Dep. at 106-108).  Moreover, Arun has not offered any admissible evidence that he received a smaller raise than his co-workers.  Second, with

regard to the budget reduction, although Arun states that he saw the expense budgets of his peers, who he claims were low performers, Arun's testimony on this point is hearsay.  Arun also admitted that he did not know whether Grayson was singling out Arun or whether the budget reduction was applicable to all of the sales representatives, and he conceded that at least one other sales representative's budget was less than his.  (*Id.* at 138, 146.)  Finally, even if Arun received a negative performance evaluation, that fact alone does not establish an adverse employment action.  *See Ahmed v. Visteon Automotive Sys.*, No. 248411, 2004 WL 2601206, at *4 (Mich. Ct. App. Nov. 16, 2004) (per curiam) (stating that "[t]here is no evidence that plaintiff lost compensation or benefits because of a negative evaluation or criticism of his job performance").  Moreover, like the other asserted adverse actions, Arun has failed to establish a causal connection.

### 2.    Helmi's Claims

Helmi's retaliation claims are based upon the same conduct as his discrimination claims. Helmi's retaliation claims fail because, as set forth above, the actions upon which his claims are based do not constitute adverse employment actions.

## C.    Harassment

A plaintiff must establish the following in order to establish a claim of harassment under Michigan law: (1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of the protected status; (3) the employee was subjected to unwelcome conduct or communication involving the protected status; (4) the unwelcome conduct was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior.  *See Quinto v. Cross & Peters Co.*, 451 Mich. 358, 368-69, 547 N.W.2d 314, 319-20 (1996).

26

### 1.      Arun's Claim

The factual basis for Arun's harassment claim is that during the business trip in January 2004 Gobat twice referred to Arun, once directly to Arun and once to Helmi but within earshot of Arun, as a "troublemaker." (Arun Dep. at 44-47.)  Arun admitted in his deposition that no one at Solvay, including Gobat, ever said anything to him about his race, ethnicity, or national origin.  (*Id.* at 54-55.)  Arun also testified that apart from Gobat's two comments during the January 2004 business trip, no one ever called him a troublemaker.  (*Id.* at 271-73.)

Arun's claim fails because Arun has presented no evidence that Gobat's comments had anything to do with Arun's race or national origin.  Gobat's isolated references to Arun as a "troublemaker," without some other basis to conclude that Gobat's comments were motivated by or directed at Arun's race or national origin, are insufficient to show that Arun was subjected to communication or conduct involving his protected status.  *See Mayville v. Ford Motor Co.*, No. 267552, 2006 WL 3040672, at *3 (Mich. Ct. App. Oct. 26, 2006) (per curiam) (noting that "only conduct or communication that is racial in nature can constitute actionable racial harassment" and that the "white bitch" epithet was the only comment of a racial nature).  Arun's admission that Gobat never made any comment to him based upon his race, ethnicity, or national origin serves to fortify the conclusion that if Gobat in fact referred to Arun as a "troublemaker," it was not motivated by race or national origin.  Moreover, Gobat made his comment more than a year and one-half after Arun wrote his letter to Solvay's President, and there is no evidence showing that Gobat was aware of the letter.

Arun's claim also fails on the fourth element, which requires a showing that a reasonable person would find that, in the totality of the circumstances, any unwelcome comments were

sufficiently severe or pervasive to create a hostile work environment. *Quinto*, 451 Mich. at 369, 547 N.W.2d at 329. Under this standard, a single incident of harassment will suffice only in extreme cases, such as a rape or sexual assault in the context of sexual harassment claims. *See Radtke v. Everett*, 442 Mich. 368, 394-95, 501 N.W.2d 155, 168 (1993). Under this standard, the two "troublemaker" comments that Gobat made to Arun are insufficiently severe to create a hostile work environment. *See Veenman v. Holland Bd. of Pub. Works*, No. 214045, 2000 WL 33521854, at *2 (Mich. Ct. App. Mar. 17, 2000) (per curiam) (holding that comments by the plaintiff's supervisor intimating that the plaintiff was too old to work in the warehouse were "[r]elatively isolated instances of non-severe misconduct" that would "not support a hostile work environment claim"); *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) (holding that two overtly racial comments made by coworkers were insufficient to establish a hostile environment because they were not "pervasive"). Thus, Arun's claim fails for this reason as well.

### 2. Helmi's Claim

Solvay contends that it is entitled to summary judgment on Helmi's harassment claim because Helmi cannot establish the final element of a prima facie case, respondeat superior liability. In other words, Solvay does not contend that Helmi's allegations regarding Grayson's comments cannot, as a matter of law, establish a hostile work environment for purposes of its summary judgment motion (although it does not concede that his evidence is sufficient in that regard either).

In order to establish respondeat superior liability, a plaintiff must "prove that the employer failed to take prompt and adequate remedial action upon notice of the creation of a hostile work environment." *Chambers v. Trettco, Inc.*, 463 Mich. 297, 312, 614 N.W.2d 910, 916 (2000). "'[N]otice of [racial] harassment is adequate if, by an objective standard, the totality of the

28

circumstances were such that a reasonable employer would have been aware of a substantial probability that [racial] harassment was occurring.'" *Elezovic v. Ford Motor Co.*, 472 Mich. 408, 426, 697 N.W.2d 851, 861 (2005) (quoting *Chambers*, 463 Mich. at 319, 614 N.W.2d at 919). "Thus, actual notice to the employer is not required; rather, the test is whether the employer knew or should have known of the harassment." *Id.*

Helmi's evidence shows that he complained twice about Grayson's conduct, the first time to Debbie Kishton, on or about August 28, 2003, prior to his September 3, 2003, meeting with Grayson and Prasch, and the second time to Hudson on January 18, 2004.  It is questionable that either of Helmi's complaints provided reasonable notice to Solvay that Helmi was complaining of racial harassment.  In his August 31, 2003, email to Kishton, Helmi recounted that he had previously told Kishton that he and Grayson had a "personality conflict," that Grayson was unfairly characterizing Helmi as a "troublemaker," and that Grayson was failing to make an effort to develop Helmi as a leader.  (Email from Helmi to Kishton of 8/31/04.)  Helmi mentioned nothing about racial or national origin harassment, and indicated that regardless of Grayson's comments, he still wanted to work with Grayson and to improve their business relationship.  (*Id.* at 2.)  Helmi's January 18, 2004, complaint to Hudson was similarly devoid of any allegations regarding racial or national origin harassment.  Although Helmi's written complaint was captioned "Continued Violations of Civil Rights," the crux of his complaint was that he was dissatisfied with his 2003 evaluation by Grayson and Grayson's continuing to label him as a troublemaker "since I'm from the Middle East."  (Letter from Helmi of 1/18/04.)   In any event, the evidence shows that Solvay investigated Helmi's complaints and took appropriate action.  With regard to his first complaint, Helmi indicated that he still wanted to work with Grayson, although Helmi requested that Prasch attend the September 3,

2003, meeting with Grayson in Cincinnati, Ohio.  In fact, Prasch attended the meeting, and Helmi continued to work with Grayson without further complaint until he submitted his January 18, 2004, complaint to Hudson.  When Helmi made his complaint in January 2004, Hudson began an investigation and spoke to several people, including Grayson, Prasch, and Christa Townsend. (Hudson Decl. ¶¶ 17-19.)  After speaking with Helmi and several witnesses, Hudson concluded that Helmi's complaints could not be substantiated, but she did not formally document her findings because Helmi resigned to take a job with another pharmaceutical company.  (Hudson Dep. at 72, 74-75; Hudson Decl. ¶ 19.)

Helmi states that Hudson acknowledges that Helmi complained about Grayson on several occasions during the 2003-04 time-frame, but he cites no evidence in support of this statement. Hudson testified in her deposition that Helmi made his complaint about Grayson in the early part of 2004.  (Hudson Dep. at 66.)  Moreover, Helmi, in his January 18, 2004, letter, stated: "This notice to the Human Resources Department is my second notice to inform the Human Resources Department for Solvay Pharmaceuticals that my civil rights are continually being violated and I need protection.  *My first notice was on August 28, 2003*."  (Letter from Helmi of 1/18/04 at 1 (italics added)).  Thus, Helmi admits to complaining only twice.  Helmi also says that Hudson never contacted any witnesses, but Hudson actually testified that Helmi did not disclose that there were other witnesses.  She identifies in her declaration the witnesses with whom she actually spoke, and her handwritten notes show that she devoted a substantial amount of time to investigating Helmi's allegations.  Accordingly, Helmi fails to show that Solvay did not take prompt action.

**D.      Constructive Discharge**

30

Helmi also alleges that he was constructively discharged from Solvay. A constructive discharge occurs only when an employee shows that his employer subjected him to conduct so severe that a reasonable person in the employee's position would have felt compelled to resign. *See Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885-86 (6th Cir. 1996); *Jacobson v. Parda Fed. Credit Union*, 457 Mich. 318, 328, 577 N.W.2d 881, 885 (1998). Some examples of intolerable conditions supporting a constructive discharge are rape by a supervisor and demotion. *See Agnew v. BASF Corp.* 286 F.3d 307, 309 (6th Cir. 2002). Events such as criticism in performance reviews and institution of performance improvement plans, without more, do not constitute objectively intolerable conditions. *See id.* at 310. In addition, "[p]roof of discrimination alone is not a sufficient predicate for a finding of constructive discharge; there must be other 'aggregating factors.'" *Yates v. Avco Corp.*, 819 F.2d 630, 637 (6th Cir. 1987) (internal quotations omitted).

Helmi's constructive discharge is essentially based upon the same conduct as his discrimination, harassment, and retaliation claims. That is, he claims that the Plan for Success, the overall "meets expectations" 2003 evaluation by Grayson, the administrative suspension with pay, and Grayson's harassing created the conditions giving rise to the constructive discharge. As noted above, however, Helmi's discrimination and retaliation claims fail, leaving only the harassment claim as a basis to support the constructive discharge. Although Helmi has presented evidence of harassment by Grayson, which the Court finds sufficient to establish a claim for harassment against Grayson on an individual basis, *see Elezovic v. Ford Motor Co.*, 472 Mich. 408, 426, 697 N.W.2d 851, 861 (2005), the evidence supporting the harassment claim fails to establish that Helmi's working conditions were so intolerable that a reasonable person would have felt compelled to resign. Although no doubt offensive to Helmi, Grayson's alleged remarks regarding "Bin Laden" and

31

Halloween and his alleged occasional references to Helmi's Middle East background or calling him a "troublemaker" are not enough, from an objective standpoint, to constitute conditions so intolerable that they would lead a reasonable person to resign. Helmi was promoted twice in a reasonably brief period of time, received substantial pay increases, and was not demoted or otherwise disciplined. Moreover, at the time Helmi resigned, he knew that Solvay was conducting an investigation into his allegations regarding Grayson. Therefore, this claim also fails.

## E.    Emotional Distress

Arun, Helmi, and Abdalla each assert IIED claims. The elements of such a claim are: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *See Hayley v. Allstate Ins. Co.*, 262 Mich. App. 571, 577, 686 N.W.2d 273, 276 (2004). "The conduct complained of must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Id.* at 577, 686 N.W.2d at 276-77 (quoting *Graham v. Ford*, 237 Mich. App. 670, 674, 604 N.W.2d 713, 716 (1999).[12] A defendant may not be held liable for mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *See Lewis v. LeGrow*, 258 Mich. App. 175, 196, 670 N.W.2d 675, 689 (2003).

Plaintiffs have not presented any specific argument with respect to their IIED claims, leaving the Court to its own speculation about the basis for such claims. It is obvious that Abdalla's claim is based upon the interview with Grayson, that Arun's claim is based upon Gobat's references to Arun as a troublemaker and/or the various rejections of Arun's applications for promotions, and that

---

[12] Although Defendants correctly note that Abdalla's IIED claim is governed by Ohio law, the Court finds it appropriate to address all three claims under Michigan law because the elements are essentially the same under both states' laws, and no Plaintiff has presented any argument on this claim.

Helmi's claim is based upon Grayson's harassing comments.  While perhaps insulting and annoying, none of these situations gives rise to conduct that can be characterized as outrageous in character or extreme in degree.  For example, Grayson's comments to Abdalla during the interview and to Helmi during 2003-2004, assuming that they are true, would demonstrate insensitivity, but they would not support liability.  Michigan courts have rejected emotional distress claims involving more egregious workplace conduct.  *See, e.g., Meek v. Mich. Bell Tel. Co.*, 193 Mich. App. 340, 346-47, 483 N.W.2d 407, 410 (1991) (concluding that the defendant's comments that the plaintiff was "chubbly," a combination of chubby and ugly, that the plaintiff was a Jewish-American princess, that the plaintiff (a female) should wear shoes like other guys, and asking the plaintiff who she had slept with to get her job did not rise to the level of extreme and outrageous behavior).  Accordingly, these claims fail.

### IV.  <u>Conclusion</u>

For the foregoing reasons, the Court will grant Defendants' motion with respect Abdalla's and Arun's claims and with respect to all of Helmi's claims against Solvay.  The case will continue solely with regard to Helmi's harassment claim against Grayson.

An Order consistent with this Opinion will be entered.


Dated:  November 21, 2006                               _____/s/ Gordon J. Quist_____
                                                                            GORDON J. QUIST
                                                                            UNITED STATES DISTRICT JUDGE